STATE of Missouri, Respondent,

v.

William WEAVER, Appellant.

No. 71051.

Supreme Court of Missouri,
En Banc.

Dec. 19, 1995.

Rehearing Denied Jan. 23, 1996.

**500**

506

HOLSTEIN, Chief Justice.

William Weaver was convicted of the first degree murder of Charles Taylor and sentenced to death.[1] A post-conviction motion was filed pursuant to Rule 29.15. Relief was denied after an evidentiary hearing. Appeals from both judgments were consolidated. This Court has jurisdiction. *Mo. Const. art. V, § 3.* The conviction, sentence and denial of relief pursuant to Rule 29.15 are affirmed.

Prior to July 1987, Charles Taylor and members of Daryl Shurn's family had been involved in the ownership and operation of drug houses. A federal drug prosecution had been commenced against Daryl Shurn's brothers, Charles and Larry Shurn, in which Taylor was to be a key witness. Taylor had worked for the Shurns and held some of the Shurns' drug houses in his name.

On the morning of July 6, 1987, William Weaver and Daryl Shurn arrived at Taylor's home in the Mansion Hills apartment complex. Their plan was to force Taylor to sign over the Shurns' drug properties which Taylor was retaining in his name against the Shurns' will. After Taylor had signed the paperwork, Weaver was supposed to kill Taylor. The plan was not completely successful.

After Weaver and Shurn entered Taylor's apartment, Taylor unexpectedly pulled a gun and escaped. Weaver and Shurn gave chase and fired several shots at Taylor. Numerous residents saw Weaver and Shurn running after Taylor, shooting at him. Weaver and Shurn followed Taylor to a wooded area where Taylor fell from his wounds. Weaver and Shurn went back to the automobile. Then Weaver returned to the wooded area where Taylor had fallen and shot Taylor again. Taylor died from several gunshot wounds to the head.

Weaver and Shurn drove away from the murder scene at a high rate of speed. Witnesses at the scene immediately reported the

William J. Swift, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for respondent.

1. Daryl Shurn was also convicted of murdering Taylor. *State v. Shurn,* 866 S.W.2d 447 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

incident to police, giving a detailed description of the vehicle. Shortly thereafter, police spotted the Shurn vehicle and gave chase. Following a collision during rush hour traffic on Interstate 70, Weaver and Shurn fled on foot. Shurn was captured at the scene, but Weaver ran off toward the Hillcrest apartment complex adjacent to the highway. Not far away, another police officer located Weaver running shoeless on a concrete street, sweating profusely. On approach by the officer, Weaver claimed he was jogging, although he was many miles from his home. He claimed to be lost. Weaver was placed under arrest and returned to the scene of the accident where one of the original pursuing police officers positively identified Weaver as the man who ran away from the Shurn car after the crash.

While awaiting trial, Weaver was incarcerated with a man by the name of Robert Dutch Tabler. Tabler testified that Weaver told him he was a hit man on the streets, that defendant and Shurn had killed Charles Taylor, and that defendant's testimony at trial would be that he was merely out jogging when the police stopped him. Weaver's primary defense at trial was misidentification by police.

On this evidence the jury convicted Weaver of first degree murder in the shooting death of Charles Taylor. He was sentenced to death. A post-conviction relief motion was filed and denied.

### I.

In his first point, defendant claims the prosecutor exercised two peremptory strikes against venirepersons B and N, in violation of the prohibition in *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). At the *Batson* hearing, Weaver objected to the state's two strikes because the "striking of the two blacks evidenced a policy and practice of the prosecuting attorney's office to virtually eliminate blacks from the jury." The prosecutor's response was as follows:

[T]here's not a pattern of discrimination or systematic exclusion. There are three blacks on the jury, which is 25% of the jury, which I think is significantly higher than the black population in St. Louis County.

The two blacks I struck with my peremptory strikes were not because the people were black but for other reasons. Let's see. Juror number 27, Ms. [B], I struck for a number of reasons: One, in the death penalty phase, although she said she could impose the death penalty, I wasn't persuaded that she could. I thought she said it with some reluctance and some hesitation. I also couldn't maintain any eye contact with her. I know bad vibrations and bad chemistry between a lawyer and a prospective juror doesn't carry great weight with the Court or, at least, the Court of Appeals, but I think it's a legitimate reason for the attorney to strike someone.

In any event, I was not persuaded that she could give the death penalty, particularly to a fellow black person. I didn't think she was strong enough. I observed her a lot of times cutting up and talking to the black gentleman next to her, Mr. [I], who I have left on the jury by way of my strikes and I simply felt that she would not be a fair and impartial juror.

With regard to juror number 54, Ms. [N], I felt that she was a weak person, both during the voir dire on the death penalty and on the voir dire on the death penalty, and on the voir dire—just the general voir dire, although Ms. Black conducted most of it. My impression of her was that she was not particularly bright and I struck a couple of white people for that very same reason. I thought in a case like this I needed intelligent people. I didn't figure she qualified in that regard and I thought she took the whole matter rather frivolously.

. . . .

Perhaps I misstated my case somewhat with Ms. [N] when I say intellectually weak. What I really meant is her personality struck me—granted, she did try hard to get on the jury, which showed a civic minded interest; but in those interviews with the Court, she just struck me as a person that was a weak personality where the death penalty is involved, and I didn't

think she would be able to vote for the death penalty.

The trial court found the prosecutor's explanations to be race-neutral.

■ It is error to use a peremptory strike to challenge jurors solely on the basis of race or on the assumption that members of a particular racial group are unable to impartially consider the state's case against a member of the juror's racial group. *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719. Where a prosecutor gives a reasonably specific, race-neutral reason for making peremptory strikes, the prosecutor's explanation will suffice unless there is an inherently discriminatory intent in that explanation. *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991). A legitimate reason is not one that makes sense but one that does not deny equal protection. *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). A reviewing court will set aside the trial court's finding as to whether the prosecutor discriminated in the exercise of peremptory challenges only if such finding is clearly erroneous. *State v. Blankenship,* 830 S.W.2d 1, 15 (Mo. banc 1992).

■ The trial judge is obligated to apply a three-pronged analysis in assessing the explanations provided by the prosecutor. *State v. Antwine,* 743 S.W.2d 51, 64–65 (Mo. banc 1987), *cert. denied* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). Trial judges must evaluate the susceptibility of the particular case to racial discrimination, the prosecutor's demeanor and, finally, the judge must evaluate the explanation itself. *Id.* at 65. Crucial to the analysis is whether similarly situated white venirepersons escaped the state's challenge. *Id.*

### A.

■ Weaver asserts that striking B because she could not give the death penalty to a fellow black violates *Batson* and is racially discriminatory on its face. The prosecutor's stated reasons for striking B were based upon her words and his observations of her conduct in the prosecutor's presence during voir dire in which the prosecutor perceived bias by juror B indicating her inability or unwillingness to impose the death penalty. What a prosecutor observes about a potential juror in voir dire, as well as what is said, may form a legitimate nondiscriminatory basis for exercising a peremptory strike. *See Purkett,* —— U.S. at ——, 115 S.Ct. at 1771. Those observations here included reluctance and hesitation in answering questions, lack of eye contact with the prosecutor, lack of strength, and "cutting up" and talking during voir dire. The prosecutor's explanation here was specific, race-neutral, and free of any racially discriminatory purpose. The trial court had the opportunity to observe the juror in question, listen to the manner in which she answered the questions, and to assess the prosecutor's demeanor and reasons for striking the juror.

Weaver cites a series of cases in which a prosecutor's racial stereotyping or assumptions made by the prosecutor about members of a minority group were held to be inadequate reasons for using a peremptory strike to dismiss a juror. *See Rush v. Smith,* 56 F.3d 918 (8th cir. en banc 1995); *Moore v. State,* 811 S.W.2d 197, 200 (Tex.App.1991); *Somerville v. State,* 792 S.W.2d 265, 268–69 (Tex.App.1990); *State v. Tomlin,* 299 S.C. 294, 384 S.E.2d 707, 710 (1989); and *State v. Holman,* 759 S.W.2d 902 (Mo.App.1988). The distinction between this case and all of those relied on by the defendant is that in this case, the prosecutor's decision to strike B was not based solely on race or upon any assumptions about persons of B's race but was based upon the way she behaved and answered questions, that is, hesitation, lack of eye contact, flippancy and other intangibles observed only by those present in the courtroom. Specifically, in *Holman* the juror in question was struck because "she is a woman and because she is black." *Holman,* 759 S.W.2d at 903. In *Holman,* neither of the reasons given were based upon conduct or answers in the courtroom but, rather, on assumptions made about race and gender. Thus, *Holman* does not require us to find a *Batson* violation in this case.

### B.

■ As to N, the state's reason for striking her was race-neutral. By her words and conduct, N led the prosecutor to believe that

she was frivolous, had a weak personality or was intellectually weak, particularly where the death penalty was concerned. It is not inherently pretextual to say that in a capital case a prosecutor would want serious jurors that are of above average intelligence and not reluctant to impose the death penalty when appropriate.

In determining if purposeful discrimination has occurred, the trial court should take into account a variety of factors, but the chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc 1992), *cert. denied* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). It is not unusual for prosecutors to use their observations, past experience and common sense in exercising peremptory challenges, so long as the factors they rely on are race-neutral. *Id.; Blankenship,* 830 S.W.2d at 15–16.

There is another factor that weighs against the contention that the prosecutor had a policy and practice to eliminate blacks from the jury, as was indicated in the defendant's objection. While this Court stops short of engaging in a "numbers analysis" to determine Weaver's *Batson* claim, the overall composition of the jury in this case belies the objection made at trial that the prosecutor's strikes against the two black jurors were racially motivated. *See Parker,* 836 S.W.2d at 940. Three of those who actually served on the jury and returned the verdict were African–Americans.

The first point is overruled.

## II.

In his second point, Weaver claims the trial court erred in admitting hearsay evidence. During cross-examination of police officer Cantwell, defense counsel elicited that the police found a briefcase belonging to Taylor near his body and that it contained a cocked and loaded .32 caliber handgun. It appears the defense was attempting to use the handgun evidence to create an inference that the victim was a violent person involved in the drug trade.

In response to this evidence, the prosecutor called Taylor's wife and another police officer, who collectively testified that Taylor had told them that he was carrying a gun because the word on the street was that Daryl Shurn intended to kill Taylor and that Shurn gave Taylor the "thumbs down" gesture when they saw one another in the city courts building.

In order for evidence to be admissible, it must be relevant, logically tending to prove a fact in issue or corroborate relevant evidence that bears on the principal issue. *State v. Mercer,* 618 S.W.2d 1, 9 (Mo. banc 1981), *cert. denied* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). Weaver argues that because he was not attempting to prove self-defense, and because the briefcase and its contents were not relevant to the defense that he had been misidentified while jogging, evidence of Taylor's motivation for carrying the loaded handgun should not have been admitted. While Weaver is correct that the primary thrust of the defense was misidentification, the defendant injected the issue that the victim was carrying a loaded weapon. That tactic was designed to permit the jury to infer that the victim was violent and posed a threat to defendant. Thus, it was defense counsel's tactic to inject into the case the victim's state of mind.

Under the doctrine of curative admissibility, "where the defendant has injected an issue into the case, the state may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Lingar,* 726 S.W.2d 728, 734–35 (Mo. banc 1987), *cert. denied* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). Under this doctrine, the defendant must first have introduced evidence, even though it might be technically inadmissible evidence. *See State v. Shurn,* 866 S.W.2d 447, 458 (Mo. banc 1993), *cert. denied* —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). The victim's statement of fear of the defendant as a reason for carrying the gun was relevant and not unduly prejudicial under the state of mind exception to the hearsay rule. *Id.; State v. Boliek,* 706 S.W.2d

847, 850 (Mo. banc 1986), *cert. denied* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986).

In his amended Rule 29.15 motion, defendant alleged that his trial counsel was constitutionally ineffective in not calling Larry Shurn's attorney as a witness to contradict the alleged confrontation at the civil courts building between Larry Shurn and Charles Taylor, in which Larry Shurn gave Taylor the "thumbs down" gesture. The attorney testified at the Rule 29.15 hearing that his memories were "very sketchy" of what occurred. In response to the question as to whether he saw Larry Shurn give the signal, the attorney answered "no" but went on to respond, "I can't say that it didn't happen." The motion court found that this impeaching witness's testimony would not have changed the outcome of the murder trial. In order to establish the constitutionally ineffective assistance of counsel, defendant must show counsel's performance was so deficient as to undermine confidence in the outcome. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Here, the witness's testimony does not prove that the gesture was not made. Counsel's failure to call such witness does not undermine confidence in the outcome. The second point is denied.

### III.

In his third point, Weaver complains that the trial court erred in failing to grant either a hearing before the verdict or a new trial after it was disclosed that the state's investigator, Lawrence Freeman, posed as a juror, wore a juror button, and mingled with the venire panel during the first day of jury selection either while the members of the venire panel were in the hallway outside the courtroom or in a jury assembly area on a separate floor.

During the early stages of the trial, Freeman became alarmed by a group of persons he believed to be members of the Weaver family who were standing near the courtroom where jury selection was taking place. According to Freeman, both men and women were carrying Gucci bags or purses capable of concealing weapons. Freeman responded by obtaining a juror badge from one of the court's staff in order to "provide security." While wearing the juror badge, Freeman was watching the persons near the courtroom door when he was approached by Mr. Smith, one of those who was ultimately selected to serve as a juror. The two were previously acquainted. Smith spoke to Freeman but was told by Freeman that he could not talk because Freeman had been called to jury duty. Freeman claimed to have gotten word to the prosecutor about the bags, who informed the judge. When the judge announced that all persons entering the courtroom would be searched, the persons with the bags left.

Defense counsel observed Smith and Freeman talking, knew Freeman was an investigator for the prosecutor, and also knew that Smith was a juror. However, she did not bring her information to the attention of the trial judge prior to the trial by moving to strike Smith for cause and did not use a peremptory strike to remove Smith from the jury. Defense counsel first brought the matter to the attention of the trial judge during the instructions conference. The trial judge was concerned that an interrogation of the jurors at that time about what had occurred before the trial might be disruptive and so did not take immediate action. After the jury had completed its deliberations, the trial judge inquired before the jurors were discharged if any of them had contact with Freeman during the trial or whether Freeman had attempted to make any effort to discuss with any of them anything regarding the case. Juror Smith replied, "I know him. I spoke to him before the trial." There is nothing in the record to indicate that Freeman spoke with Smith about the subject matter of the trial.

Without a doubt, the court employee who gave the juror button to Freeman should be reprimanded, and Freeman's conduct was thoughtless, if not bizarre. He also should be admonished by his employer. Trial judges, lawyers, and those who are assigned to provide security and look after the needs of jurors while they are being selected, hearing evidence or deliberating must constantly

guard against any outside influence or distraction.

 Nevertheless, Freeman's actions do not rise to the level of *State v. Post*, 804 S.W.2d 862 (Mo.App.1991), where a deputy sheriff and a police officer not assigned to the case mingled with jurors at their hotel rooms, and one deputy and a juror engaged in sexual improprieties such that the jury had been so distracted that it could not give "due and fair consideration of the facts." *Id.* at 862–63.

Where misconduct involving jurors during the progress of the trial is alleged, the verdict will be set aside unless the state affirmatively shows that the jurors were not subject to improper influences. *State v. Edmondson*, 461 S.W.2d 713, 723 (Mo.1971). In this case, where the facts are fully disclosed and they conclusively demonstrate an absence of prejudice to the defendant and an absence of any improper influence on the juror in question there is no prejudice. Under these circumstances, Weaver is not entitled to a new trial.

### IV.

 Defendant argues that the state's closing arguments during both the guilt and penalty phases of the trial were erroneous and further that counsel was ineffective in failing to object to some of the improper arguments. A review of the record discloses that defense counsel objected vehemently to almost all the arguments complained of here and that several of the objections were sustained, followed by curative instructions to the jury. The trial court has considerable discretion in allowing argument of counsel, and the rulings are reversible only for abuse of discretion where argument is plainly unwarranted. *State v. Armbruster*, 641 S.W.2d 763, 766 (Mo.1982). Our review of the arguments discloses neither error in permitting the arguments nor ineffective assistance of counsel in failing to object.

### A.

First, Weaver alleges that the prosecutor improperly emphasized his position as elected prosecutor in his choice of seeking the death penalty. The specific arguments were as follows:

(1) In the guilt phase, the prosecutor said, "If you don't believe the state's case here, you twelve people would never convict anybody." Defense counsel objected, and the court instructed the jury to disregard the comment.

(2) In the penalty phase closing, the prosecutor said, "Well, if this isn't [the proper case for the death penalty], what would it be? If this isn't a case where you can impose a death penalty, where people go out to Mr. Taylor's house to kill him because he's a witness, then what case would you ever return it in? ... If this isn't a case that calls for the death penalty, I can't imagine one that would." The court overruled defense counsel's objection to this argument.

(3) Continuing his penalty phase closing argument, the prosecutor said, "I mean, if this isn't the case for the death penalty, then there's no case you'll do it ... and, quite frankly, if you don't sentence him to die in this case, there's no point in having a death penalty.... I'm the prosecuting attorney in this county, the top law enforcement officer in the county. I decide in which cases we ask for the death penalty and in which cases we don't." The trial court sustained the defendant's objection to the last statement and instructed the jury to disregard it.

(4) Finally, the prosecutor said, "If these facts don't justify, don't cry out for the death penalty, then which facts do?" To that statement, the trial court overruled the objection.

 A prosecutor's argument may make reasonable inferences from the evidence. *Shurn*, 866 S.W.2d at 460; *State v. McDonald*, 661 S.W.2d 497, 506 (Mo. banc 1983), *cert. denied* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The inferences need not necessarily seem warranted. *Grubbs v. State*, 760 S.W.2d 115, 119 (Mo. banc 1988), *cert. denied* 490 U.S. 1085, 109 S.Ct. 2111, 104 L.Ed.2d 672 (1989). Statements by a prosecuting attorney in argument indicating his or her opinion that the accused is guilty, where it is apparent that such opinion is based on the evidence in the case, is permissible. *State v. Moore*, 428 S.W.2d

563, 565 (Mo.1968); *State v. Paglino,* 319 S.W.2d 613, 625 (Mo.1958). In this case, the prosecutor's rhetorical questions may seem flamboyant, if not somewhat abrasive, to a juror's ears. However, given the eyewitness testimony of how the murder was carried out and the cold execution manner in which the victim was killed, it is fair for the prosecutor to point out the strength of the state's case. The use of the rhetorical questions was, for the most part, a fair comment on the strength of the case.

▮▮▮ As for his statements regarding his position as prosecuting attorney of the county, the court properly sustained the objections and directed the jury to disregard the argument. Trial courts have a superior vantage point from which to assess the pervasive effect of an improper argument. Thus, whether it can be dissipated by timely and appropriate action short of declaring a mistrial is a matter within the sound discretion of the trial court. *State v. Carter,* 641 S.W.2d 54, 60 (Mo. banc 1982), *cert. denied* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983).

This case is distinguishable from cases relied on by the defendant, including *State v. Evans,* 820 S.W.2d 545 (Mo.App.1991). There the prosecutor said, "If [the defendant] were innocent, I wouldn't bring a charge." *Id.* at 547. Merely stating that the prosecutor determines which penalty to ask for in capital cases is not the same as saying that if the defendant were innocent, he would not be charged. The objection, followed by the curative instruction, is adequate here.

In addition, this case is distinguishable from *Newlon v. Armontrout,* 885 F.2d 1328 (8th Cir.1989). There the court found that because the prosecutor expressed his personal belief in the propriety of the death penalty, emphasized his position of authority in the county as prosecutor, attempted to associate the defendant with several well-known mass murderers, appealed to the jurors' personal fears and emotions, and asked the jurors to "kill" the defendant, under the totality of the circumstances rendered the penalty phase of the trial fundamentally unfair. 885 F.2d at 1336–37. The arguments here do not rise to the level of the egregious conduct that is

reported in *Newlon.* Neither is this case comparable with *State v. Storey,* 901 S.W.2d 886 (Mo. banc 1995), where this Court reversed the punishment in a capital case because the prosecutor, among other excesses, had compared the brutality of the murder as being worse than all other murders in the county. Here there was no abuse of discretion in the trial court's ruling on defense counsel's objections.

### B.

▮▮▮ In his closing remarks, the prosecutor called the defendant's misidentification defense a "cock and bull story" and a "smokescreen," referred to the defendant as a liar, said defense counsel was "bold" and called into question the credibility and motives of several defense witnesses. Weaver characterizes the state's closing arguments as portraying defense counsel as having suborned perjury. Comments to the effect that a defendant or a defense witness were lying have repeatedly been upheld. A prosecuting attorney may comment on the evidence and the credibility of witness and, in the process, may belittle and point to the improbability and untruthfulness of specific testimony. *State v. Johnson,* 496 S.W.2d 852, 859 (Mo. 1973). Here the comments on the testimony of the witnesses were well within the range of the prosecutor's adversarial responsibilities in making closing argument.

▮▮▮ Directly arguing that defense counsel has suborned perjury or fabricated evidence has been held to be prejudicial error. *State v. Burnfin,* 771 S.W.2d 908, 912–13 (Mo.App.1989); *State v. Harris,* 662 S.W.2d 276, 277 (Mo.App.1983). However, the prosecutor here did not go that far when he said:

> I don't know whether the smokescreen [defense counsel is] creating is bothering you and creating an impression in your mind, creating confusion or, you know, you see, it's nothing more than a smokescreen....
>
> . . . .
>
> [Defense counsel has] got the nerve to show you these photographs that she said look like they were taken at nighttime. I

guess you just have to believe with somebody that bold that she is going to suggest that was taken at night time as opposed to bad exposure, if you want to buy that boldness.

To suggest that the arguments advanced by defense counsel are "smokescreens" or "bold" fall short of accusing counsel of suborning perjury or the other egregious accusations against defense counsel that occurred in *Burnfin, Harris,* or other cases relied on by the defendant. At most, the comments by the prosecuting attorney were near error which, by definition, is not error. The point is denied.

### C.

■ Lastly, Weaver puts forth a collection of allegedly improper arguments made by the state during the punishment phase, including the complaint that the prosecutor argued matters outside the evidence that lacked evidentiary support. The prosecutor argued that had Weaver not run out of bullets he would have shot the arresting officer. He argued that if a prosecution witness had been out jogging a short while after the crime Weaver would have also shot that witness. Finally, he argued that the death penalty would be a deterrent. Our review of the penalty phase arguments discloses that these arguments are reasonable. The fact that the crime had been planned for the purpose of killing a witness and for the purpose of advancing what was apparently a very violent drug enterprise, permits an inference that the defendant had a high propensity for violent conduct in the future. The claim that the trial court abused its discretion in permitting the argument is without merit. The point is denied.

### V.

Weaver complains that the prosecutor failed to disclose all evidence favorable to the accused in response to his pretrial requests. The details of the state's response to Weaver's pretrial request were not included in the defendant's record filed on appeal. Neither was the response to the request presented at the post-conviction hearing. As best can be determined from the record, the following apparently was disclosed to defense counsel prior to trial:

Tabler had been an inmate at the St. Louis County Correctional Facility for nine months prior to trial. Charges were pending against him for receiving stolen property and a misdemeanor offense for possession of marijuana. His prior convictions included sodomy and oral copulation in 1980 in California, for which he was sentenced to three years in prison and served two, rape in 1983 in California, upon which he received a three-year sentence and served twenty-two months in prison, and a possession of methamphetamines conviction in 1986 in California for which Tabler received six months, four of which were served. It was also disclosed that Tabler was on parole from the state of California at the time of trial and was facing approximately a year and a half in prison there. Finally, it was disclosed that Tabler had made a deal with the state that in exchange for his testimony, the state would recommend a year for the receiving stolen property charge and six months for the possession of marijuana charge. The record also disclosed that Tabler had been charged as a persistent offender and was subject to an extended term of up to sixteen years but, because of the agreement made by the state, Tabler knew he could possibly get out of prison in five months time.

Weaver complains here that his constitutional right to a fair trial was violated because the state failed to disclose, in addition to the above, that (1) prior to the time Tabler came forward with the information about Weaver, he had been offered a five year sentence; (2) Tabler gave a false name when initially arrested, and (3) Tabler's bond had been set at $500,000.

■ The United States Supreme Court has held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). A due process violation occurs "if there is a reasonable probability that, had the evidence been dis-

closed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). A reasonable probability of a different outcome exists where the failure to disclose the evidence "undermines confidence in the outcome of the trial." *Id.* at 682, 105 S.Ct. at 3383. Considering the information that was disclosed by the state showing Tabler to have been convicted of multiple contemptible crimes and that his testimony was given in exchange for an extremely generous deal by the state makes the failures to disclose complained of by the defendant pale in comparison. The absence of the allegedly undisclosed evidence does not undermine confidence in the verdict. *See Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

In any event, the defendant has failed to make clear what was and was not disclosed prior to trial and has put this Court in the position of having to parse through the record to determine exactly what was not disclosed. That alone would be sufficient to deny this claim without further discussion. However, because this is a capital case, the Court has carefully reviewed the record before resolving this point against Weaver.

## VI.

■ Weaver argues that in a letter written by the prosecutor two days after he was sentenced, the prosecutor improperly "attempted to poison" the trial judge who was then in the process of preparing a report pursuant to Supreme Court Rule 29.08(c). The purpose of the report is to assist this Court in its proportionality review. The prosecutor's letter and the police report attached recounted that one Willy Greer had made statements that he had attended a meeting which included Daryl Shurn where it was suggested that Weaver might be recruited not only to kill the victim here, but also to kill a police officer. The prosecutor's letter suggested that had defendant not been arrested in this matter, the officer would also have been killed.

The only authority cited by Weaver in support of his contention that the prosecu-

tor's conduct was improper and requires reversal is *State v. Storey*, 901 S.W.2d 886 (Mo. banc 1995), where it is stated that a prosecutor has a duty to "serve justice, not just win the case." *Id.* at 901. Since the prosecutor's letter and the attached police report were received after sentencing and was not considered in any respect in determining defendant's guilt or sentence, it is difficult to comprehend how it could have been prejudicial to the defendant, even assuming it is an improper communication. The point is denied.

## VII.

■ Weaver complains that in the post-conviction relief proceeding the court clearly erred in impeding his attempts to obtain meaningful discovery by (a) overruling Weaver's motion to compel answers to interrogatories and requests for production, (b) quashing Weaver's deposition subpoenas, (c) denying his motion to compel answers to certified deposition questions, and (d) overruling motions to seek reconsideration of all the foregoing discovery rulings. Despite Weaver's suggestion that the motion court's handling of discovery matters should be reviewed merely for error, rulings on requests for discovery in post-conviction proceedings are reviewed to determine if the motion court clearly erred. *See State v. Six,* 805 S.W.2d 159, 173 (Mo. banc 1991), *cert. denied* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Our review does not demonstrate that the motion court clearly erred in denying defendant's various discovery motions.

■ The discovery requests pertained to prosecutorial discretion to seek the death penalty, the personnel and hiring practices of the St. Louis County Prosecuting Attorney's Office, the involvement of any and all employees in defendant's and Shurn's cases, and the comparative cost of death penalties as opposed to life without parole. Defendant also sought to compel answers to numerous certified deposition questions. In one instance, the witness being deposed was a social worker who worked with Tabler and had been a former police officer. The trial court refused to compel the social worker to explain why he had left his employment as a police officer or about the time, place and

content of his conversations with Tabler about the defendant's involvement in the crime. In addition, officer Layshock, who had worked with a witness in getting him to testify against Shurn, was not required to answer questions at the post-conviction deposition as to whether he had been the subject of any disciplinary actions in the police department.

Nothing in defendant's argument suggests how such evidence may have been relevant to the issues raised in the post-conviction petition. The ruling of the motion court in rejecting the apparent use of discovery for a "fishing expedition" is not so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration of defendant's discovery requests. The denial of the discovery requests was not clearly erroneous.

### VIII.

In his eighth point, Weaver violates Rule 84.04(d) by not setting forth briefly and concisely what action or ruling of the trial court is under review but rather presents a collage of various rulings both by the trial court and the post-conviction court denying relief for what he characterizes as "multiple acts of misconduct" by the prosecutor. Because of a violation of the rules on briefing, if this were not a death penalty case, none of the points raised would be considered. The Court shall attempt to discuss what it perceives to be the points raised.

### A.

Under the first part of his argument, Weaver contends that the Rule 29.15 motion should have been sustained because of (1) the prosecutor's over-aggressive cross-examination of Weaver at trial about prior arrests, (2) over-aggressive prosecutorial examination about a sexual relationship Weaver had with a teenage girl who testified on defendant's behalf and (3) the prosecutor's allegedly improper closing argument that defense counsel was expensive because she was "terrific."

 With regard to the cross-examination of defendant about prior arrests, it occurred after defendant and certain of his character witnesses had testified that in some neighborhoods in St. Louis, young black men are often arrested without cause. This evidence left the jury with the inference that while defendant had prior arrests, the arrests were unjustified. Under the doctrine of curative admissibility, the prosecutor was entitled to delve into the defendant's arrests, introducing otherwise inadmissible evidence to counteract the negative inferences. *Shurn,* 866 S.W.2d at 458. Any objection to this would have been without merit. This aspect of the claim is denied.

 Defendant called a teenage female to explain why Weaver's car was in the Mansion Hills parking lot. The prosecutor cross-examined her regarding her sexual relationship with defendant. A witness's relationship with the defendant is a relevant subject of cross-examination to show the witness's bias or prejudice in favor of or against a defendant. *State v. Johnson,* 700 S.W.2d 815, 817 (Mo. banc 1985), *cert. denied* 476 U.S. 1119, 106 S.Ct. 1980, 90 L.Ed.2d 663 (1986). Here there was no objection to the evidence, there was no prosecutorial misconduct or ineffective assistance in defense counsel's failure to object. This claim is denied.

 Defendant claims the prosecutor improperly commented on his right to counsel. This argument came in response to defense counsel's argument that Weaver was not a hit man. Defense counsel said:

> Any hit man does not have to struggle to get an attorney. He's got money all up there, sell some of his diamond rings and everything to get them, any hit man. But a William Weaver, a young man snatched off the street would have to struggle, would have to fight, would have to read [sic] his case, would have to try to get somebody to represent him.

> And a hit man wouldn't have to be driving the likes of a '73 Buick LeSabre. He'd have the fine kind of cars that this kind of money can buy.

To this, the prosecutor responded:

> So I don't know how [defense counsel's] fee was paid; but I guarantee you, she's not inexpensive, because she's terrific.

Parties have considerably more leeway when argument is retaliatory and during rebuttal. *Shurn*, 866 S.W.2d at 461. There was no error, plain or otherwise, in permitting the argument and counsel was not ineffective for failing to object.

### B.

 Defendant faults the prosecutor for allegedly failing to disclose a tape of a call to an emergency "911" number reporting that Taylor had been shot and giving a description of the suspect and for failing to disclose a notation on an arrest record in the prosecutor's file noting "D in maroon jacket." It is argued that the contents of the 911 tape and the notation on the police record "may have caused any description contained in the 911 tape to take on greater significance for purposes of additional discovery." The argument fails to disclose what significance the 911 tapes had to the defense. The argument also fails to disclose what relevance the notation "D in maroon jacket" might have had. To have any significance, the two matters require that a series of assumptions be made favorable to defendant's theory before a failure to disclose can be shown in any way to have been material or exculpatory. Here, Weaver has made no showing as to the materiality or exculpatory nature of the tape or the notation. A defendant is not entitled to information on the mere possibility that it might be helpful but must make some "plausible showing" how the information would have been material or favorable. *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 1002 n. 15, 94 L.Ed.2d 40 (1987). The mere possibility that these undisclosed items might have led to future discovery does not implicate a due process violation. *See State v. Parker*, 886 S.W.2d 908, 916–17 (Mo. banc 1994).

### C.

 In his third claim under his eighth point, Weaver argues the trial court erred in overruling objections to the admission of photographs seized during the search of the Shurns' residence and that the motion court clearly erred in denying his post-conviction motion that Westfall engaged in prosecutorial misconduct in offering the photo-graphs in evidence. The photographs were introduced during rebuttal following testimony by defendant that he knew Daryl Shurn only "from the streets" and never met the Shurn brothers. The photographs were relevant in that they tended to impeach Weaver's testimony because he was pictured in several of the photographs. There was no error in admitting the photographs, plain or otherwise. These questions should have been properly raised on direct appeal rather than by post-conviction motion and that portion of the claim is denied for that reason. *See State v. Hunter*, 840 S.W.2d 850, 860 (Mo. banc 1992), *cert. denied* —— U.S. ——, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1992). Point VIII is denied.

### IX.

 Weaver argues that the autopsy report of the victim should not have been admitted into evidence because it was hearsay. One exception to the hearsay rule is that business records, if properly identified, may be admitted. The custodian of the autopsy report testified as to its identity, the mode of preparation and that it was made in the regular course of business. On that basis, the court could receive the report in evidence. § *490.680*, RSMo 1994; *State v. Cheatham*, 340 S.W.2d 16, 19 (Mo.1960); *State v. Jennings*, 555 S.W.2d 366, 367 (Mo. App.1977).

### X.

 Under his tenth point, defendant again in violation of Rule 84.04(d) combines a series of eleven claims of ineffective assistance of counsel which he asserts should have been found by the motion court. To prevail, Weaver had to establish before the motion court that trial counsel failed to perform at the degree of skill, care or diligence of a reasonably competent attorney and that the performance was so prejudicial as to undermine the reliability of the result of the trial. *Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984).

## A.

 The first claim is that competent counsel would have objected to Tabler's testimony that Weaver was a "hit man" because such testimony was evidence of other crimes. No evidence was adduced on this point at the post-conviction hearing. Trial counsel, though called to testify, was not asked why she had failed to object. Had an objection been made, it would have been of no avail. Tabler's testimony was reporting a statement made by the defendant in the context of explaining Weaver's involvement in the murder of Taylor. Among other justifications for admitting evidence of other crimes is where such evidence is admissible to establish motive. *State v. Oxford*, 791 S.W.2d 396, 399 (Mo. banc 1990). Evidence that Weaver claimed to have been a killer for hire was relevant to establishing his motive for the murder of Taylor. While details of other murders may have been inadmissible, the evidence here was limited to what defendant told Tabler was his reason for involvement in this murder. Motive was a legitimate issue in the case.

## B.

 Weaver claims counsel was ineffective in failing to object to the giving of MAI–CR3d 313.44 (effective 1–1–87). This Court has held that instruction, when followed by MAI–CR3d 313.46 (effective 1–1–87), is constitutional and does not violate *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *State v. Petary*, 790 S.W.2d 243, 245 (Mo. banc 1990). Here, MAI–CR3d 313.46 was given and any tinge of unconstitutionality removed.

## C.

Weaver claims trial counsel was ineffective for failing to object to the prosecutor's inquiries regarding bullet holes in Weaver's body and for failing to present evidence that Weaver "was the victim of someone dissatisfied with his work" as a disc jockey. This claim was not preserved in the post-conviction relief motion and is deemed waived.

## D.

 Weaver next complains that counsel failed to seek a change of venue due to pretrial publicity. The trial court found that the voir dire record adequately covers that potential problem and that no prejudice resulted under *Strickland* by counsel's failure to seek a change of venue. The record supports that finding.

## E.

 Weaver next faults counsel for failing to bring out evidence regarding law enforcement's inadequate search for a gun. On that point, the motion court found that counsel's decision was not demonstrated to be prejudicial to the defendant's case under the *Strickland* standard. It might be added that failure to cross-examine a state's witness regarding how carefully a search was conducted was well within the range of permissible trial strategy where the primary thrust of the defense was misidentification.

## F.

 Weaver argues that counsel was ineffective in failing to object to a police officer's testimony about a lack of gunshot residue on Weaver's hands and counsel's failure to call a highway patrol chemist. The question by the state was prompted by defense counsel's questioning regarding gunshot residue tests and the negative results of those tests. It was appropriate on redirect to ask the officers if they had any explanation for the lack of the gunshot residue. No evidence was offered at the post-conviction relief hearing that the officers were not qualified to explain what factors might reduce the possibility of finding residue. Counsel is not ineffective for failing to make an objection unless it is apparent that the objection would have been meritorious. *Six*, 805 S.W.2d at 168.

 The police officers testified that, based on their experience, passage of time between firing and the time of taking the tests (in this case, four to five hours) and perspiration and the wiping of hands can cause gunshot residue to dissipate. The chemist did not directly refute those statements but testified only that the number of

shots fired increases the chance of finding residue, that it is possible to find residue for up to six hours, although residue is more likely found within one and one-half hours, and that the chemist had no opinion regarding the effect of perspiration. The chemist's testimony would not have established any defense but, at most, would have marginally impeached the testimony of the police officers regarding the absence of gunshot residue. It cannot be said that counsel's alleged failure undermines confidence in the outcome of the trial. Thus, Weaver has failed to establish the prejudice prong of the *Strickland* requirement.

### G.

As to the claim that counsel should have more extensively cross-examined one of the officers about the gunshot residue evidence, the motion court found that there was no evidence to support this ground presented at the evidentiary hearing. Having failed to present evidence about what more extensive cross-examination would have disclosed, the claim was properly denied.

### H.

Weaver claims that counsel should have objected to the evidence and argument of the prosecutor as to why no gunpowder residue was found on him. The evidence pointed to in support of this argument was that of the chemist, who indicated that "very little data was provided" by the officers responsible for obtaining the residue tests as to when the tests were performed or the type of weapon. From this, Weaver argues that counsel should have presented evidence demonstrating that the absent data precluded the state's explanation for the absent residue. As noted above, the additional information about when the residue tests were performed and the type of weapon were not shown to undermine the officers' explanation. Counsel's failure to present evidence which would have been purely impeachment on a collateral matter of the officers' lack of attention to detail in reporting data to the chemist is clearly within the range of conduct by competent counsel. Weaver also fails to establish prejudice on this point.

### I.

Weaver complains that his defense counsel should have put on evidence to correct one member of the venire panel who, in response to a question on voir dire about her feelings regarding the death penalty, said,

I really haven't considered it in particular cases, but just as a fact of economics of the State keeping people for life and the cost and I would think that crime would go down if the death penalty were enforced more. So I haven't really thought about it in specific cases and thought that people should get it or not.

Even though made in the presence of other jurors, the isolated response did not so permeate the trial that those jurors hearing it would be unlikely to follow the instructions. The economic cost of imposing a death sentence is irrelevant to any issue submitted to the jury. Counsel cannot be faulted for failing to present irrelevant evidence. Neither error nor prejudice have been demonstrated. The claim is denied.

### J.

Weaver argues that counsel failed to impeach a physician's testimony that no bullet fragments were recovered from the victim's body by the testimony of two police officers that bullet fragments were recovered following the autopsy. In this case, there was virtually no dispute but that the victim died of six traumatic gunshot wounds to the head. The presence or absence of fragments was not necessary to establish the cause of death. The failure of counsel to present impeachment evidence regarding the matter of the recovery of bullet fragments is not prejudicial.

### K.

Finally, Weaver challenges counsel's failure to present ballistics evidence showing more than one weapon was used. The evidence presented at the post-conviction hearing showed that the evidence on this point was inconclusive as to whether more than one weapon had been used. The motion court correctly found no prejudice in failing to present that evidence. In addition, the

jury could have found that both Shurn and defendant had fired shots. The possibility that two guns might have been used was consistent with the state's case and would have done nothing to advance defendant's misidentification defense. This point is without merit.

## XI.

 In his eleventh point, Weaver argues that he should have been permitted to file a supplemental Rule 29.15 motion after the time for filing amendments to such motion had run. The only authority cited for that proposition is *State v. Chambers*, 891 S.W.2d 93 (Mo. banc 1994). In *Chambers* this Court observed that trial counsel's conduct was not ineffective in failing to object to an instruction. *Chambers* did not overrule the fundamental principle that the time limits for filing and amending pleadings under Rule 29.15 are valid and mandatory and the trial court is without authority to give additional time beyond that provided by Rule 29.15(f). *State v. Six*, 805 S.W.2d 159, 170 (Mo. banc 1991), *cert. denied* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991); *Day v. State*, 770 S.W.2d 692, 695 (Mo. banc 1989). The motion court did not err in failing to permit a supplemental amended Rule 29.15 motion.

## XII.

Christine Coslick testified that on July 6, 1987, at about 7:45 a.m., while watching from her apartment in the Mansion Hills apartment complex, she saw a black male being chased by two other black males down a nearby hill into a wooded area. One of those giving chase was wearing a maroon shirt. She heard shots from the wooded area, saw the two black males return to the car and then saw the one in the maroon shirt go back to the woods. She heard additional shots, saw the man in the maroon shirt return to the car and then observed the vehicle leave. The man in the maroon shirt came within fifty yards of Coslick. Later that same day, she viewed a lineup. At the lineup, Coslick remembered not only the shirt but the general build of the individual. The person she identified was defendant.

Witness Robert Mackin testified that on the same date at the same time he was laying in bed in his apartment and heard shots. Upon going to the window, he saw two men walking briskly away from the wooded area, one of whom appeared to be in a "dark red outfit." This individual went back to the car then returned to the wooded area where Mackin heard three more gunshots. That day Mackin was taken to a lineup where he picked out the defendant based on stature and clothing.

 Weaver argues that because he was the only person in the lineup wearing maroon or red clothing, the trial court should have suppressed the identification. In order to succeed on this claim, he must carry a burden of proof that there was a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977).

 Lineups have been held not to be impermissibly suggestive merely because of the color or characteristics of the clothing of persons in the lineup. *State v. Tringl*, 848 S.W.2d 29, 32 (Mo.App.1993); *State v. Morant*, 758 S.W.2d 110, 117 (Mo.App.1988); *State v. Howard*, 699 S.W.2d 58, 59 (Mo.App. 1985). The rule seems to be that a lineup will be impermissibly suggestive only if the clothing is the sole basis for identification.

 The linchpin of due process in identification procedures is reliability, not suggestiveness. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. Here the witnesses relied not only on the color of clothing but of defendant's general build and appearance. Both witnesses had an opportunity to view Weaver at the time of the crime. Both witnesses' attention had been turned to Weaver because of the gunshots. Their identification of Weaver was consistent with their description. Both witnesses expressed a rather high level of certainty at the confrontation. The confrontation occurred the same day as the shooting. Under the totality of the circumstances, their identification has sufficient indicia of reliability. *See State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. banc 1989). It is true that in the case of both witnesses, identifica-

tion was based largely on general build and clothing. However, it cannot be said on the record here that a "very substantial likelihood of irreparable misidentification" occurred. Short of such evidence, courts rely on the good sense and judgment of jurors for determining the trustworthiness of the identification.

> Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.... The defect, if there be one, goes to weight and not to substance.

*Manson,* 432 U.S. at 117, 97 S.Ct. at 2254.

■ Weaver further complains about the identification of defendant near the scene where he was arrested by the officer who pursued the vehicle in which defendant was riding. After defendant was arrested, he was brought back to the crime scene. He now argues that this procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.

To repeat, the linchpin of due process in identification procedures is reliability rather than suggestiveness. The reliability of identification is greatly enhanced by returning a freshly apprehended suspect to the scene of an offense for prompt identification by eyewitnesses. *State v. Pettit,* 719 S.W.2d 474, 477 (Mo.App.1986); *see also State v. Jackson,* 477 S.W.2d 47, 51–52 (Mo.1972). The identification by the pursuing officer at the scene was not impermissibly suggestive or unreliable.

### XIII.

After the crash, police found keys in the Shurn vehicle. In the meantime, Weaver's car, a Buick LeSabre, was found in the Mansion Hills parking lot. The LeSabre was towed from the parking lot and placed in police custody. The keys found in the Shurn vehicle were tried and found to fit the doors, ignition, glove box and trunk of the LeSabre.

■ Weaver argues that no circumstances justified a warrantless search of his vehicle. Weaver does not seem to challenge the warrantless *seizure* of the vehicle. Here the vehicle was seized at the scene of a murder and was apparently used by Weaver as transportation to the scene of the crime. That justified the warrantless seizure of the vehicle.

■ Checking the locks of the LeSabre to see if the keys found in the Shurn car fit the car found at the scene of the crime was not an unreasonable intrusion or violation of any expectation of privacy. Simply trying a key in an exterior lock of an automobile does not constitute a search. *United States v. Concepcion,* 942 F.2d 1170, 1172 (7th cir. 1991); *United States v. Lyons,* 898 F.2d 210, 212–13 (1st cir. 1990); *United States v. Grandstaff,* 813 F.2d 1353, 1358 n. 5 (9th cir. 1987). Because the officers had probable cause to seize the vehicle, they could also have searched the interior of the car for weapons and other instrumentalities of the crime without obtaining a warrant. *Chambers v. Maroney,* 399 U.S. 42, 48–52, 90 S.Ct. 1975, 1979–82, 26 L.Ed.2d 419 (1970). This would include opening the glove box. This point is denied.

### XIV.

Weaver claims that the composition of the grand jury resulted from systematic exclusion of nonwhites, resulting in underrepresentation of African–Americans. Essentially the same data supporting the claim were submitted in *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993). There the data were held to be unpersuasive. No precedential value would be gained by reconsidering the claim here. The point is denied.

### XV.

Weaver's fifteenth point makes a four-pronged attack on the constitutionality of the death penalty. He claims it is unconstitutional because of (1) vagueness of the aggravating factor of "depravity of mind," (2) inadequacy of proportionality review, (3) unrestricted prosecutorial discretion, and (4) failure of the death penalty to serve legitimate government purposes.

Weaver claims the "depravity of mind" aggravating factor is excessively vague.

We do not have to decide whether, in this case, the depravity of mind aggravating factor was excessively vague because the jury found two valid statutory aggravating circumstances under § 565.032.2(12). They found he murdered a potential witness and acted as an agent for another. We will affirm a death sentence based on the finding of one valid statutory aggravating circumstance, regardless of the failure of another. *State v. Sloan,* 756 S.W.2d 503, 509 (Mo. banc 1988), *cert. denied* 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1989).

The claim of unconstitutionality in the proportionality review must also fail. The constitution does not require proportionality review. Rather, it is required by statute. *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo. banc 1993), *cert. denied* — U.S. ——, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1993); § *565.035,* RSMo 1994. This Court has rejected the argument that it must engage in a statistical analysis of cases to determine whether the punishment is disproportional. *Ramsey,* 864 S.W.2d at 327–28. The Court's method of proportionality review does not violate Weaver's due process rights, his right to a fair trial or his right to be free from cruel and unusual punishment under the state or federal constitutions.

Similarly, no authority is cited or found holding that the prosecutorial discretion to seek the death penalty is unconstitutional. This claim lacks merit and has been rejected on numerous occasions. *Parker,* 886 S.W.2d at 933; *Ramsey,* 864 S.W.2d at 330; *see also Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976).

The final claim under Point Fifteen is that the Missouri death penalty statute violates Weaver's constitutional rights because no legitimate government goal is advanced by such punishment and it is, therefore, excessive. This claim, too, has been repeatedly rejected and no precedential purpose would be served in discussing it again here. The claim is denied.

## XVI.

In his sixteenth point, Weaver argues that the judgment in the post-conviction hearing was invalidated because "most of the 'findings' either adopted verbatim or with only minor editorial changes [the state's] proposed findings." This Court's review is limited to determining whether the motion court clearly erred. *Rule 29.15(j).* While trial courts must act independently in making findings of fact and conclusions of law, it is not error for a trial court to request or receive proposed findings and, in appropriate cases, to adopt those findings. The point is denied.

## XVII.

Various claims are raised in his seventeenth through twenty-first points which have been argued and found to be without merit in recent cases before this Court. Specifically, Point XVII argues that our pattern instructions, which tell the jury "If you do not find the defendant guilty of murder in the first degree, you must consider whether or not he is guilty of murder in the second degree," is an "acquittal first" instruction and violates due process. This claim has recently been denied. *State v. Wise,* 879 S.W.2d 494, 517 (Mo. banc 1994), *cert. denied* — U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). In Point XVIII Weaver argues that he was denied due process because individual voir dire was not allowed of the jurors. This Court has repeatedly rejected that claim. *Parker,* 886 S.W.2d at 921; *State v. Whitfield,* 837 S.W.2d 503, 509 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905, 917 (Mo. banc 1992). In his nineteenth point, Weaver claims that he should have a separate jury to determine punishment. This claim has also often been rejected by this Court. Weaver's twentieth claim is that the trial court erred in failing to give a non-MAI cautionary instruction. Again, that claim has recently been denied. *Parker,* 886 S.W.2d at 921; *State v. Kilgore,* 771 S.W.2d 57, 63 (Mo. banc 1989). Finally, Weaver challenges the instruction on reasonable doubt. This complaint has been presented and denied on numerous occasions. No precedential value would be served by further discussion of the final five points. *See Rule 84.16.* The claims are denied.

### XVIII.

The Court has examined the evidence in this case and determines that the sentence, when compared to similar cases, is neither excessive nor disproportionate. *See Shurn,* 866 S.W.2d at 467; *Parker,* 886 S.W.2d at 933–34; *State v. Williams,* 652 S.W.2d 102, 113–14 (Mo. banc 1983); *State v. Blair,* 638 S.W.2d 739, 759–60 (Mo. banc 1982), *affirmed* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983). In each of the above cases, defendants were sentenced to death who had murdered victims who were witnesses or potential witnesses.

### CONCLUSION

The judgment imposing the death penalty for murder in the first degree is affirmed. The judgment denying relief from the post-conviction relief proceeding is affirmed.

BENTON, PRICE, LIMBAUGH, ROBERTSON and COVINGTON, JJ., and EDWARDS, Senior Judge, concur.

WHITE, J., not participating because not a member of the Court when case was submitted.