**STATE of Missouri, Respondent**

v.

**James Henry HAMPTON, Appellant.**

No. 79354.

Supreme Court of Missouri,
En Banc.

Dec. 23, 1997.

Rehearing Denied Jan. 27, 1998.

Pete Carter, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for Respondent.

WHITE, Judge.

James Henry Hampton appeals from his conviction for the first degree murder of Frances Keaton and the death sentence imposed for that crime.[1] We affirm.

Reviewing the evidence in the light most favorable to the verdict,[2] the following facts were established at trial. At approximately 9:00 p.m. on the evening of August 2, 1992, Mr. Hampton parked a green Pontiac Bonneville in the lot of Fellowship Baptist Church in Warrenton. Mr. Hampton told passersby that he was having car trouble, but declined offers of assistance, saying that he had a bicycle. Leaving a note on his windshield that read: "Car trouble. Gone for help. S.G. Gambosi," Mr. Hampton rode the bicycle about three miles to the neighborhood where Frances Keaton lived.

Mr. Hampton knew, through his acquaintance with Patricia Supinski—Ms. Keaton's realtor—that Ms. Keaton and her fiance, Allen Mulholland, had access to a checking account containing at least $30,000. Using a copy of Ms. Keaton's house key provided to him by Ms. Supinski, Mr. Hampton entered Ms. Keaton's house dressed in dark clothing, wearing a stocking cap over his face, and carrying a sawed-off shotgun. Some time after 10 p.m., Mr. Hampton awoke Ms. Keaton and Mr. Mulholland, who were asleep in their bedroom, and told them: "I've come here to rob you." After binding Mr. Mulholland's and Ms. Keaton's hands and feet, Mr. Hampton demanded $30,000 from them. They replied that they did not have that much money, but Ms. Keaton said she thought that she could get $10,000 from her pastor. Mr. Hampton untied her and allowed her to get dressed. When she attempted to escape, Mr. Hampton overpowered her, and eventually placed a coathanger around her neck and threatened to kill her if she again resisted him. Mr. Hampton told Mr. Mulholland that he had a police scanner and that, if the police learned of the kidnapping, he would kill Ms. Keaton. Mr. Hampton then took Ms. Keaton outside to her car and drove her towards the Supinski farm in Callaway County. While they were driving, at 1:15 a.m. on August 3, Mr. Hampton had Ms. Keaton call her pastor on Mr. Mulholland's cellular phone and ask him if he could provide her with $10,000 cash by nine o'clock that morning. The pastor later called her back on the cellular phone, but all contact with Ms. Keaton was lost at 2:24 a.m.

At some point during the drive, Mr. Hampton learned from his police scanner that law enforcement authorities had been alerted to the kidnapping. According to his own testimony, Mr. Hampton had decided in advance to kill his hostage if police learned of the kidnapping before he received the ransom. Carrying through with his plan, Mr. Hampton bound and blindfolded Ms. Keaton and took her to a wooded area one half mile from the Supinski farm. Once there, he killed Ms. Keaton with several hammer blows to her head and then buried her body.

The morning after killing Ms. Keaton, Mr. Hampton drove her car back to Warrenton and attempted to retrieve the green Pontiac he had left at the Fellowship Baptist Church. He abandoned his attempt when he saw that police were keeping the car under surveillance. Late that night, after police had impounded the car, he was apprehended at-

---

1. More accurately, Mr. Hampton's appointed counsel appeals; Mr. Hampton has filed a motion asking that his conviction be summarily affirmed and an early execution date set.

2. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993).

tempting to enter the locked impound lot, but gave an alias and was released. After that, Mr. Hampton fled the State and was eventually apprehended in New Jersey, where he had committed another murder. As he was about to be taken into custody, Mr. Hampton shot himself in the head.

### Right to Self–Representation

■■■ Mr. Hampton contends that he was denied his right to represent himself at trial. The Sixth Amendment's guarantee of assistance of counsel implies a correlative right to dispense with such assistance.[3] A criminal defendant who makes a timely, informed, voluntary and unequivocal waiver of the right to counsel may not be tried with counsel forced upon him by the State.[4] The determinative question, then, is whether Mr. Hampton made such a waiver.

On September 18, 1995, ten months before trial started, Mr. Hampton filed a "Motion/Demand/Notice for Self–Representation" wherein he asked the court to enter an order "permitting self-representation ... as explained ... in *Faretta....*" At that time, he also filed an "Entry of Appearance," advising "all persons connected [with the case] that he is now the attorney of record...." After hearing Mr. Hampton argue his motion, the trial court suggested that it delay ruling on the motion, but when pressed by Mr. Hampton, overruled it. On October 13, Mr. Hampton again sought to have the motion for self-representation taken up, but the court ruled that it would follow its original ruling on the issue. At that point, Mr. Hampton filed a second entry of appearance and motion for self-representation, and then sought a writ of prohibition in the court of appeals, seeking to prohibit further proceedings until he was allowed to represent himself. When that petition was denied, Mr. Hampton sought similar relief in this Court, which was also denied in March of 1996. The trial court

again heard argument from Mr. Hampton on July 5, and, on July 16, noted that it was continuing to rule against Mr. Hampton's request.

The relevant considerations in evaluating a motion for self-representation were concisely set forth by the Eighth Circuit Court of Appeals in the recent case *Hamilton v. Groose*:

> A criminal defendant's motion to represent himself involves two mutually exclusive constitutional rights: the right to be represented by an attorney, and the right *not* to be represented by an attorney. A court must "indulge in every reasonable presumption against [a defendant's] waiver" of his right to counsel, *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), and require the defendant to make a knowing, intelligent, voluntary, and unequivocal request before concluding that he has waived his right to counsel and invoked his right to represent himself.[5]

Recognizing that a defendant who is allowed to proceed pro se may argue on appeal that the right to counsel was improperly denied, the court emphasizes that ambiguous requests for self-representation are not sufficient: "The probability that a defendant will appeal either decision of the trial judge underscores the importance of requiring a defendant who wishes to waive his right to counsel to do so explicitly and unequivocally."[6] What *Faretta* guarantees is the right to forgo the assistance of counsel in defending oneself, not the right to insist on self-representation in addition to representation by counsel: "*Faretta* does not require a trial judge to permit 'hybrid' representation...."[7] "Because there is no constitutional right for a defendant to act as co-counsel, the refusal [to grant a defendant's motion for self-representation] does not violate the dictates of *Faretta.*"[8]

---

**3.** *Faretta v. California,* 422 U.S. 806, 832, 95 S.Ct. 2525, 2539–40, 45 L.Ed.2d 562 (1975).

**4.** *Id.* at 835–36, 95 S.Ct. at 2541–42.

**5.** 28 F.3d 859, 862 (8th Cir.1994) (emphasis in original).

**6.** *Id.* at 863.

**7.** *McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 953–54, 79 L.Ed.2d 122 (1984).

**8.** *Cross v. United States,* 893 F.2d 1287, 1292 (11th Cir.1990).

In his numerous filings and arguments on this issue, Mr. Hampton never suggested that by asking to act as his own lawyer, he intended to waive his right to be represented by counsel. Mr. Hampton indicated, in arguing his motion to the trial court, that it was intended to prevent his attorneys from making "certain strategic decisions" in his case with which he disagreed. He argued that attorneys "are to advise and represent, not to replace or second-guess the defendant.... [I]f I am the attorney of record, then I will be able to make that decision. I don't intend to conduct the voir dire." Mr. Hampton also reported that he did not intend to conduct the cross-examination of "many, if any of the witnesses." The tenor of Mr. Hampton's argument is accurately reflected by the trial court's characterization: "At this point in time you're telling me that you want [defense counsel] to represent you, you want them to do the voir dire, you want them to cross-examine witnesses. But you want to have the final say-so."

In .arguing that his conduct amounted to unequivocal waiver of the right to counsel, Mr. Hampton relies exclusively on *United States v. Arlt*, where the Ninth Circuit Court of Appeals reversed a conviction because the defendant's right to represent himself was violated.[9] That case is factually distinguishable from the present matter. In *Arlt*, the defendant expressed the desire to represent himself before counsel had been appointed, and persisted in that position even when the trial court sought to dissuade him from it by explaining the disadvantages of forgoing the assistance of counsel.[10] Here, Mr. Hampton never expressed the desire to completely forgo the assistance of counsel and, without being prompted by the court, expressed the desire that his lawyers conduct crucial aspects of the case.

■ The factual situation here is much more similar to another Ninth Circuit case: *United States v. Kienenberger.*[11] In that case, the defendant made numerous requests to be appointed "counsel of record," but also requested that the court appoint advisory counsel to assist him on procedural matters.[12] The court affirmed the conviction, holding that defendant "never relinquished his right to be represented by counsel at trial. His requests to represent himself were not unequivocal."[13] As the *Arlt* court held: "A defendant must make an explicit choice between exercising the right to counsel and the right to self-representation...."[14] In this case, Mr. Hampton sought to have the best of both worlds. While the trial court attempted to indulge Mr. Hampton's requests to be heard along with his attorney, it did not err in refusing to make him "attorney of record," since that request did not amount to an unequivocal waiver of the right to counsel's assistance.

### Waiver of Right to Remain Silent

■ Mr. Hampton argues that his Fifth Amendment right against self-incrimination was violated because the trial court did not make a finding on the record that he had waived the right "knowingly, voluntarily and intelligently" before he took the stand and confessed to murdering Ms. Keaton. In support of this contention, Mr. Hampton cites two cases, *Boykin v. Alabama*,[15] and *Rolfes v. State*,[16] which hold that a trial court must advise a defendant on the record of his right to remain silent before accepting his guilty plea. These cases are plainly inapplicable here since, before allowing Mr. Hampton to take the stand, the court advised him of his right not to testify, that the court would instruct the jury that it could not infer guilt from his failure to testify, that by testifying he was subjecting himself to cross-examination, and that by testifying he was enabling the prosecution to present evidence of his prior criminal record. Mr. Hampton testi-

9. 41 F.3d 516 (9th Cir.1994).

10. *Id.* at 517, 519–20.

11. 13 F.3d 1354 (9th Cir.1994).

12. *Id.* at 1356.

13. *Id.*

14. *Arlt*, 41 F.3d at 519.

15. 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

16. 574 S.W.2d 948 (Mo.App.1978).

fied that he understood each of these admonishments, but was nevertheless taking the stand against his attorneys' advice.

■ While Mr. Hampton now points to some remarks made to the court-appointed psychiatrist who examined him for competency that, viewed in a very stilted manner, arguably suggest Mr. Hampton thought he had to put on evidence in order to prove his innocence, he does not actually allege that the waiver was not made knowingly, intelligently, and voluntarily. Instead, he asserts that the failure of the trial court to make that specific finding on the record was erroneous. Because this claim was not made to the trial court, giving it the opportunity to make the finding, we review it for plain error only.[17] Certainly no miscarriage of justice occurred because the trial court did not write the words "knowingly, voluntarily, and intelligently" in the docket sheet. And even if we read Mr. Hampton's argument much more broadly than he has actually made it, the record completely contradicts the idea that Mr. Hampton was not making an informed decision in waiving his right to remain silent. Mr. Hampton specifically and emphatically affirmed that he was aware of the rights he was waiving. Justice is not offended by a man taking the witness stand and accepting responsibility for the terrible acts that he has committed.

### Competency to Stand Trial

■ As a result of Mr. Hampton's self-inflicted gunshot wound, he suffered damage to both the right and left frontal lobes of his brain. Accordingly, he argues that he was not competent to stand trial. "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."[18] Upon defense counsel's motion, two experts examined Mr. Hampton.

The defense's expert neurologist, Dr. Pincus, testified that, as result of his examination, he concluded that Mr. Hampton's frontal lobe injury severely impaired his judgment, causing him paranoia that impaired his ability to assist in his defense. He based this conclusion on physical tests and on his interview with Mr. Hampton where he exhibited that he did not trust his defense counsel or Dr. Pincus. Dr. Parwatikar, a State forensic psychiatrist, examined Mr. Hampton, filed a report and testified before the court. Dr. Parwatikar concurred that Mr. Hampton had suffered some brain damage and was distrustful of his defense counsel. He concluded, however, that Mr. Hampton did not suffer from any mental disease or defect, and that he was able to assist his attorney in his defense. The trial court explicitly found Dr. Parwatikar's testimony to be more believable than Dr. Pincus's and, based upon that testimony and observation of the defendant's behavior in court, found that Mr. Hampton was competent. We defer to the factual findings of the trial court.[19]

Mr. Hampton contends that his case is "almost directly on point" with the only case he cites in support of his position: *State ex rel. Sisco v. Buford.*[20] In that case, this Court prohibited the defendant from being tried because he was unable to assist in his defense due to a self-inflicted gunshot wound that damaged his frontal lobes.[21] The parallels end there, however. In that case, after hearing expert testimony, the trial court entered its findings of fact that: "defendant has no memory of the events of the date of the alleged crime and cannot aid in his defense and that said loss of memory is permanent and that defendant can never aid in his defense."[22] Surely, *Sisco* does not stand for the proposition that any person with a frontal

---

17. Rule 30.20.

18. Section 552.020.1, RSMo 1994.

19. *State v. Wilkins,* 736 S.W.2d 409, 415 (Mo. banc 1987); *State ex rel. Sisco v. Buford,* 559 S.W.2d 747, 748 (Mo. banc 1978); *State v. Petty,* 856 S.W.2d 351, 353 (Mo.App.1993).

20. 559 S.W.2d at 747.

21. *Id.*

22. *Id.*

lobe injury is presumptively incompetent to stand trial. The factual situation here is distinct. An expert report found, and the trial court ruled, that Mr. Hampton suffered no inability to assist in his defense. We will not reweigh the evidence and second-guess this factual conclusion supported, as it is, by the expert testimony presented to the trial court and the court's own observation of the defendant's behavior.

Mr. Hampton also concludes that Dr. Parwatikar evaluated Mr. Hampton by the wrong standard in determining whether he was competent. The proper standard, Mr. Hampton asserts, is whether a defendant "has a sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." [23] Mr. Hampton does not attempt to explain, nor are we able to discern, how this standard is, in any meaningful sense, not met by Dr. Parwatikar's findings that Mr. Hampton "understands the charges pending against him and has the capacity to assist his attorney in his defense." The trial court did not err in ruling that Mr. Hampton was competent to stand trial.

### Seizure and Search of Pontiac Bonneville

■ Mr. Hampton asserts that the trial court erred in refusing to suppress items seized during the warrantless search of the car he had left parked at Fellowship Baptist Church while he committed the murder. Soon after Ms. Keaton's kidnapping was reported, FBI agents investigating the crime came to suspect that the Pontiac Bonneville parked at the church was used in the crime. Accordingly, they had the car watched and, eventually, towed. Two days later, they searched the car and found several items that were introduced against Mr. Hampton

at trial. These included a notebook and various documents in Mr. Hampton's handwriting, some indicating that he used the name S.G. Gambosi, a file, a shotgun, and a map of Missouri.

■ Searches of automobiles, because they are mobile, are generally excepted from the warrant requirement.[24] While Mr. Hampton concedes that police may seize a vehicle and search it later as long as they have probable cause at the time of the seizure,[25] he contends that, in this case, no probable cause to search the car existed at the time it was seized. While the State bears both the burden of production and the burden of persuasion in showing that a warrantless search is valid,[26] we review the facts in the light most favorable to the trial court's ruling.[27] The ultimate question of whether these facts are sufficient to support probable cause is decided de novo.[28]

The evidence before the suppression court consisted of the testimony of the two FBI agents who investigated Ms. Keaton's kidnapping. The officers testified that their attention was first drawn to the green Pontiac by the report of a neighbor of Ms. Keaton's, Norma Smith, that she had seen a man wearing dark clothes entering the neighborhood on foot at about ten o'clock that night, and that she had seen this man earlier at her church. She testified that she was startled to see him and that he had seemed startled to see her. In talking to other parishioners, the FBI agents learned that the owner of the Pontiac had been behaving unusually and had refused offers of a ride, instead leaving on a bicycle. The agents concluded that a man on a bicycle could easily ride from the church to the spot where Ms. Smith saw the man in the approximately one hour between the sightings. The agents knew that the kidnapper and Ms. Keaton had left in her car and

**23.** *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788–89, 4 L.Ed.2d 824 (1960) (per curiam).

**24.** *State v. Lane*, 937 S.W.2d 721, 722 (Mo. banc 1997).

**25.** *Id.* at 722–23; *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970).

**26.** Section 542.296.6, RSMo 1994.

**27.** *State v. Rodriguez*, 877 S.W.2d 106, 110 (Mo. banc 1994).

**28.** *Ornelas v. United States*, 517 U.S. 690, ——, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996).

suspected that the Pontiac might be have been used by the kidnapper to approach the scene, since they had accounted for all other cars parked in the vicinity. The agents checked the registration, which showed that the car was registered to a Sam Gambosi. Although agents found that the car had only been sold to "Gambosi" a week earlier, the address he had given for the registration did not belong to anyone by that name, nor had anyone at that address ever heard of such a person.

 As the United States Supreme Court has recently reiterated, probable cause is a flexible, common-sense concept:

> Articulating precisely what ... "probable cause" mean[s] is not possible. [It is a] commonsense non-technical conception[ ] that deal[s] with " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " .... [P]robable cause to search ... exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.[29]

Examining the facts before the trial court, we find that probable cause to search was present at the time the car was seized. The fact that its driver was seen in the neighborhood where the crime was committed shortly before it occurred, generally matched the description of the kidnapper, had behaved somewhat suspiciously at the time the car was parked, and the fact that the car was registered to a fictitious address reasonably gave officers cause to believe that the Pontiac was involved in Ms. Keaton's kidnapping, and that evidence of her whereabouts or of the identity of her kidnapper could be found therein. The trial court did not err in overruling the motion to suppress the evidence seized from the Pontiac.

### Separate Penalty Phase Jury

 Mr. Hampton claims that the trial court erred in overruling his motion for a separate penalty phase jury. As this Court has repeatedly held, this claim is meritless.[30]

### Non–MAI Cautionary Instruction

 Mr. Hampton alleges that the trial court erred in refusing to give a non-MAI cautionary instruction prior to death penalty voir dire. The proffered instruction indicated that the death qualification questions were routine and did not imply guilt. This Court has consistently held, and we now reiterate, that the refusal to give such an instruction is not error.[31]

### Reasonable Doubt Instruction

 Mr. Hampton contends that the reasonable doubt instruction in MAI–CR3d 313.30, given in the penalty phase of this case, deprived him of due process. Specifically, Mr. Hampton challenges the language explaining that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of the truth of a proposition. The law does not require proof that overcomes every possible doubt." As this Court has repeatedly found, this language is consistent with the due process guarantee.[32]

### Voir Dire Defining Degrees of Murder

 Mr. Hampton alleges error based on the following exchange during voir dire:

> [Defense counsel]: It's necessary for this next question that I'm going to ask you that I give you a short kind of description of what the law is as it relates to homicide. Now, you've heard that Mr. Hampton has been charged with murder in the first degree. That is the highest level of homicide. Murder in the first degree we define it as what we call deliberate murder. It is not the only level of homi-

---

29. *Id.* at ——, 116 S.Ct. at 1661.

30. *See, e.g., State v. Weaver,* 912 S.W.2d 499, 522 (Mo. banc 1995); *State v. Parker,* 886 S.W.2d 908, 921 (Mo. banc 1994); *State v. Whitfield,* 837 S.W.2d 503, 509–10 (Mo. banc 1992); *State v. Kilgore,* 771 S.W.2d 57, 63 (Mo. banc 1989).

31. *See, e.g., Weaver,* 912 S.W.2d at 522; *Parker,* 886 S.W.2d at 921; *Kilgore,* 771 S.W.2d at 63.

32. *See, e.g., State v. Smulls,* 935 S.W.2d 9, 22 (Mo. banc 1996); *State v. Brown,* 902 S.W.2d 278, 287 (Mo. banc 1995); *State v. Chambers,* 891 S.W.2d 93, 105 (Mo. banc 1994).

cide. We also have something we call murder in the second degree which is the next step down. And then we have two forms of what we call manslaughter. So they're all four levels of homicide. Murder in the first degree being the highest and murder in the second degree being the next step down.

Now, as I said, murder in the first degree is defined as deliberate murder. I think we used to use the word "premeditated." But we don't use that any more. It is called deliberate murder. It is defined by the law as cool reflection for a period of time no matter how brief. Okay, that's our highest level. Deliberate murder.

Murder second degree is what we call knowingly murdering someone. The difference between the two goes to what we call the state of mind of the defendant.

[Prosecutor]: Judge, may we approach the bench?

[At sidebar]:

[Prosecutor]: I'm going to object to some what I perceive is a misstatement of the law. Trying to distinguish second from first.

THE COURT: The objection will be sustained. Let's proceed.

[Defense counsel]: Judge, may I address the court on this?

I intend to ask the jury whether in this or any other case they've learned that kidnapping is involved or weapons involved they will automatically feel that is murder in the first degree. I believe it's necessary to define the difference between murder in the first degree and murder in the second degree in order to place that question in context. I believe I'm correctly defining those two levels of homicide.

THE COURT: Well, I think I will allow you to, if they consider one thing is automatic, but you, I don't want you getting into the definitions of first and second degree murder. You can ask them if they think that kidnapping or something else would influence them in the case if you want to. I don't think you really do want

to, but if you want to ask that question you can.

[Defense Counsel]: I do want to ask that question.

. . . .

THE COURT: The objection will be sustained as to the question that was put to the jury just now.

[Defense Counsel]: So the court is allowing, just for clarification purposes, the court is allowing me to ask about abduction and a weapon involved, but the court is not allowing me to ask whether the juror would automatically feel if a weapon or abduction or kidnapping is involved whether that would be murder in the first degree?

THE COURT: Oh, if you want to ask them if that automatically is murder in the first degree, you are entitled to ask that.

[Defense Counsel]: I think it's necessary to define the concept.

THE COURT: I don't want you to go into the definitions of what is murder first and murder second.

[Defense Counsel]: I don't know how to ask them if it's murder in the first degree without telling them before I do that. I guess I've already done it. But I mean I don't know.

THE COURT: The objection will be sustained as asked. Let's proceed.

[In open court]:

[Defense counsel]: . . . . Does anybody on this side of the room feel that if they heard that a gun was involved in a case or an abduction, that they would automatically conclude that this is murder in the first degree?

 The nature and scope of questions asked at voir dire is reviewed for abuse of discretion.[33] Mr. Hampton argues that defense counsel was prohibited from conducting voir dire on the issue of the difference between the mental states required to find a defendant guilty of first and second degree murder. Mr. Hampton cites *State v.*

---

**33.** *State v. Coats*, 835 S.W.2d 430, 433 (Mo.App. 1992).

*Brown*,[34] where this Court found reversible error in the trial court's refusal to allow the defense to ask potential jurors whether they would be able to follow the law and require the State to meet its burden of proving beyond a reasonable doubt that self-defense was not present. Whether the principle of *Brown* also applies to questions about degrees of murder, however, need not be addressed, since the trial court here did not actually prevent the defense from presenting information to the jury or asking the question it sought to ask. As Mr. Hampton notes in his brief, no question was actually before the panel at the time objection was made, and no objection to a particular question was sustained. Although defense counsel was told not to define degrees of murder, he had, as he notes in the above colloquy, already done so. The panel was not told to disregard this information, and objection was not made to it within their hearing. Defense counsel asked his question about whether anyone would presume first degree murder from the use of a gun, and several jurors responded that they would. Under these circumstances there was no conceivable abuse of discretion, since the trial court did not actually restrict the ability of the defense to conduct the voir dire in the manner it requested.

### Voir Dire on Signing Death Verdict

■ Mr. Hampton argues that the trial court erred in permitting the prosecution to ask potential jurors whether they could sign a death verdict if chosen as foreperson. This claim is baseless, and this Court has repeatedly rejected it.[35]

### Failure to Provide Child Care for Jurors

■ Mr. Hampton asserts that the trial court erred in refusing to provide child care for jurors, because that failure effectively, and unconstitutionally, excluded women and poor people from the jury. This Court has already examined this question and found

that provision of child care for jury members is not constitutionally mandated.[36] We continue to follow that holding here.

### Admissibility of Post–Mortem Photographs of the Victim

■ Mr. Hampton argues that nine photographs of Ms. Keaton's corpse admitted into evidence were unduly prejudicial. Three photographs were pictures of the body at the site where it was buried by Mr. Hampton, as it was being uncovered. Three were of the body as it was being readied for transport, and three were photographs taken during the autopsy. Mr. Hampton concedes that the trial court has broad discretion over the admission of photos and its ruling will be affirmed absent an abuse of that discretion.[37] Mr. Hampton also concedes that even gruesome photos are admissible if they "corroborate the testimony of a witness, ... assist a jury better to understand the facts and testimony of witnesses, [or] prove an element of the case."[38] As Mr. Hampton admits, the grave scene photographs were used by the State to corroborate and illustrate the testimony of an officer and an investigator who assisted in the excavation of the burial site. The photographs reflected both the condition of the scene and the condition of the body at the time of the excavation. As to the autopsy photographs, they were relevant to corroborate and illustrate the testimony as to the cause of Ms. Keaton's death. The admission of these photographs was not an abuse of discretion.

### Review of Sentence

Mr. Hampton contends that his death sentence is unconstitutional because this Court does not engage in "meaningful" proportionality review. We have repeatedly rejected

---

34. 547 S.W.2d 797 (Mo. banc 1977).

35. *See e.g., State v. Chambers*, 891 S.W.2d 93, 102 (Mo. banc 1994); *Clemmons v. State*, 785 S.W.2d 524, 529 (Mo. banc 1990); *State v. McMillin*, 783 S.W.2d 82, 91–92 (Mo. banc 1990).

36. *State v. Whitfield*, 837 S.W.2d 503, 510 (Mo. banc 1992).

37. *McMillin*, 783 S.W.2d at 101.

38. *Id.*

this argument,[39] and continue to do so.

As required by section 565.035.3, we review the record to ensure that the death penalty was properly imposed in this case. There is no evidence in the record that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Three aggravating circumstances were found by the jury: that Mr. Hampton had a prior serious assaultive criminal conviction;[40] that Mr. Hampton committed the murder for the purpose of receiving money from the victim or another;[41] and that the victim was killed in the course of a kidnapping.[42] The evidence supports the finding of one aggravating circumstance as required by section 565.030.4(1), and supports the other aggravating circumstances found.

Considering the crime, the strength of the evidence, and the defendant, the sentence of death is proportionate to similar cases. In this case, Mr. Hampton's own testimony establishes that he broke into Ms. Keaton's bedroom, terrorized, kidnapped, bound and blindfolded her, took her to a secluded area and killed her with complete detachment, in an utterly brutal manner, when his plan to ransom her failed. The penalty imposed in this case is not disproportionate to similar cases involving executions in the course of kidnappings, cases where the victim was brutally killed while bound and helpless, and killings for pecuniary gain.[43]

## Conclusion

The judgment of the trial court is affirmed.

All concur.

---

**39.** *See, e.g., State v. Weaver*, 912 S.W.2d 499, 522 (Mo. banc 1995); *State v. Brown*, 902 S.W.2d 278, 291 (Mo. banc 1995); *Whitfield*, 837 S.W.2d at 515.

**40.** Section 565.032.2(1), RSMo 1994.

**41.** Section 565.032.2(4), RSMo 1994.

**42.** Section 565.032.2(11), RSMo 1994.

**43.** *State v. Simmons*, No. 77439 (Mo. banc November 25, 1997); *State v. Skillicorn*, 944 S.W.2d 877 (Mo. banc 1997); *State v. Smith*, 944 S.W.2d 901 (Mo. banc 1997); *State v. Basile*, 942 S.W.2d 342 (Mo. banc 1997); *State v. Copeland*, 928 S.W.2d 828 (Mo. banc 1996); *State v. Kreutzer*, 928 S.W.2d 854 (Mo. banc 1996); *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996); *State v. Brown*, 902 S.W.2d 278 (Mo. banc 1995); *State v. Six*, 805 S.W.2d 159 (Mo. banc 1991).