

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110252 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | Cause No. 1822-CR3371-01 |
| | ) | |
| EUGENE P. HAMPTON, | ) | Honorable Michael K. Mullen |
| | ) | |
| Appellant. | ) | Filed:  March 7, 2023 |

## Introduction

A trial jury convicted Eugene Hampton of murder in the first degree and armed criminal action. On appeal, Hampton challenges the trial court's denial of his request to represent himself at trial and his motion to suppress evidence and the admission of that evidence at trial. We affirm the judgment of the trial court.

## Factual and Procedural Background

*Evidence at Trial*

On the evening of September 26, 2018, Rodrick Pitts received a phone call from Eugene Hampton. Hampton was at home at 827 Elias with his fiancé Bernetta Lee and her grandson, Troy Fowler. During the phone call, Hampton told Pitts to come over and pick up the money Hampton owed him. After getting off the phone with Pitts, Hampton stated, "I'm going to kill this MF."

Pitts drove with his cousin and his nephew, Davyion Perry, to Hampton's house and parked his van across the street.[1] Pitts got out of the van and told Perry he would be back. Pitts then went to the house, where Hampton let him in. Inside the house, Lee and Fowler witnessed Hampton and Pitts engage in a conversation, but they could not hear what was said. They then saw Hampton pull a gun and shoot Pitts several times.

As Pitts ran from the house, Hampton chased him. Perry, still in Pitts's van, saw Pitts jump off the front porch and run from the house, while Hampton chased and shot at him. Perry saw Pitts grab at his body as if he was hurt. After Perry lost sight of Pitts, Hampton came back to the van. Hampton pointed a gun at Pitts's cousin, and the cousin ran away. Hampton then re-entered the house at 827 Elias.

Perry left the van to find Pitts. He found Pitts lying face down in the yard of 836 Elias with blood gushing from his head. At trial, Perry identified Hampton as the shooter.

When Hampton returned to the house, he told Lee and Fowler, "We got to go." The three went to Lee's granddaughter's house, but left after Lee's granddaughter refused to have Hampton in her house.

When police officers arrived at the scene, they were informed that Hampton had gone back into his house at 827 Elias. The officers waited outside until a SWAT unit deemed the house safe to enter. When police officers entered the house, they did so without a search warrant or consent to search. At trial, Detective Tom Walsh testified that, though blood was found on the front porch, police found no crime scene inside the house and most of the items found inside "turned out not to be significant to this crime." Those items included a shotgun, which "probably had nothing to do with this particular crime," and a box containing marijuana and packaging

---

[1] Pitts's cousin was not identified by name at trial.

supplies, which also "was not significant to the crime scene." Police ultimately decided there was no crime scene inside the house.

Outside, police found a trail of blood later confirmed to be that of Pitts. The trail led from the stoop of the house, through Hampton's yard, across the street to Pitts's van, to where Pitts lay dead. The medical examiner confirmed that Pitts suffered multiple gunshot wounds to the head, cheek, abdomen, and forearm. Pitts's cause of death was a gunshot wound to the head.

When police later interviewed Fowler and showed him a photo array, Fowler identified Hampton as the shooter. Police arrested Hampton for the murder of Pitts.

*Pre-Trial Procedure*

Hampton was charged with murder in the first degree and armed criminal action, and was appointed counsel.

On March 8, 2019, Hampton filed the first of at least four *pro se* motions for appointment of new counsel. Hampton accused his counsel of walking out of a meeting, cutting a meeting short to see other clients, showing favoritism to the prosecutor, and conspiring against him. On April 18, 2019, the trial court denied Hampton's motion.

In a motion filed on June 26, 2019, Hampton's counsel moved to suppress all evidence found in Hampton's residence. The evidence included interior photographs, a shotgun, marijuana, sandwich bags, and an electronic scale.

On July 9, 2019, Hampton's counsel requested a mental health evaluation of Hampton because counsel had "good cause to believe defendant is not competent to proceed to trial based upon his observations and attempted consultations with the defendant." The trial court ordered the evaluation, and Hampton was found competent to stand trial.

In a letter of October 11, 2019, Hampton informed the trial court that his counsel was biased in claiming that Hampton had mental health issues and accused counsel of concealing page two of his discovery. Hampton also filed a second *pro se* motion for appointment of new counsel.

In a March 25, 2020 letter to the trial court, Hampton accused his counsel of insulting him, misleading the court regarding Hampton's mental health, and providing him incomplete discovery. For the third time, Hampton asked for "an exchange of attorney for an attorney whom [*sic*] would afford me the opportunity to have fair legal representation." If he had to keep his existing counsel, Hampton requested that counsel file a motion for the grand jury transcript and a bill of particulars, and provide all his discovery. Hampton insisted he wanted "to be afforded the right to proper legal counsel."

Finally, on August 31, 2020, Hampton filed another *pro se* motion for appointment of new counsel.

*Evidence at Suppression Hearing*

On April 16, 2021, the trial court held a hearing on Hampton's motion to suppress evidence, at which Detective Walsh was the only witness.

When Detective Walsh arrived at 827 Elias, uniformed officers surrounded the house. Pitts lay in a yard across the street. Police had been informed that the suspect had run back into the house. Believing someone was potentially barricading the house or holding hostages, police requested a SWAT unit.

When the SWAT unit arrived at 8:39 p.m., officers attempted to persuade anyone in the house to exit, but received no response. The SWAT unit then sent a robot into the house. When the robot was unable to fully enter the house, SWAT officers entered the house. At 12:33 a.m.,

the SWAT unit determined that no one was in the house and returned custody of the scene to the investigating officers.

When they went to the front door, police officers saw blood on the front porch trailing from Pitts's body. Without a search warrant or consent, the officers entered Hampton's house to determine if there was a crime scene or victims inside. An evidence technician took photographs of the interior of the house and items therein. On a coffee table in the living room, police officers found a bag of marijuana, a scale, and sandwich bags. They also found a shotgun in one of the bedrooms. Detective Walsh testified that the items found in Hampton's house ultimately did not contribute to the investigation of Pitts's murder.

The trial court denied Hampton's motion to suppress evidence without elaboration.

*Pre-Trial Conference*

On June 4, 2021, the Friday immediately preceding the Monday, June 7 trial setting, the trial court held a pre-trial conference. The court heard argument regarding Hampton's motions *in limine* and reiterated its denial of Hampton's motion to suppress evidence. Hampton then interjected.

HAMPTON: Another thing is I'd like to, you know represent this Court myself.

COURT: You want to not have Mr. Barron with you, you want to represent yourself; is that right?

HAMPTON: Yes, sir.

COURT: Okay. I'm going to deny that request.

HAMPTON: [A]s long as Mr. Barron is going to be honest and try to help me prove my case, I don't mind him, you know. But if he don't do like I ask him to do – because he's trying to get down to the bottom of this with asking what happened.

The trial court asked whether there were specific things Hampton wanted his counsel to do that he did not do. Hampton complained that, after his counsel provided him with discovery,

5

Hampton spilled juice on page two, and counsel did not replace it. In response to the court's inquiries, Hampton repeatedly denied that counsel failed to provide him with any other discovery. Hampton assured the court that counsel had reviewed all the evidence with him and they had discussed the case. Defense counsel confirmed that he provided all discovery to Hampton and informed the court that page two of the discovery was blank. The court then continued its colloquy with Hampton.

> COURT: Okay. So I'm going to deny your request to go to trial without Mr. Barron. I'm going to leave Mr. Barron on as your trial counsel.
>
> HAMPTON: You know, it's not going to work. It's a conflict of interest. Let me ask you a question, Your Honor: If you had a lawyer representing you and you and your attorney get into an argument and your attorney tells you, says, "I don't like you," would you want that attorney to represent you as your lawyer after he made a statement saying that he don't like you?
>
> COURT: Is that the basis of why you want Mr. Barron off your case?
>
> HAMPTON: That and . . . that he is not an honest man. He is lying to you right to your face saying that page two is blank. It wasn't blank when he gave it to me.
>
> COURT: Okay. Nothing you have told me is changing my mind about whether or not Mr. Barron is going to be your lawyer for your case next week.
>
> HAMPTON: It's a violation of my rights for due process. . . . [I]f Mr. Barron is sitting next to me and [co-counsel] Mr. Mahaffey is sitting next to me, I'm going to speak as I please because I have the right to aid and assist in my own defense.
>
> Shortly thereafter, the pre-trial conference turned to other issues.

*Trial Procedure*

On the next business day, June 7, 2021, Hampton's trial began. At no point during trial did Hampton request to proceed without counsel or to represent himself.

During the State's case, Hampton's counsel renewed his motion to suppress testimony regarding the search of the interior scene. He objected on the same basis to the admission of exhibits 2, 3, 4, 5, and 6, five photographs that depicted the inside of 827 Elias and the shotgun,

6

marijuana, and paraphernalia found inside the house. The trial court overruled the objections, and the photographs were admitted into evidence.

In its closing and rebuttal arguments, the State made no mention of the shotgun, marijuana, or paraphernalia found in Hampton's house. Hampton's counsel, on the other hand, argued that Pitts came to Hampton's house to collect his "drug debt," and referred to the shotgun and the marijuana found in the house.

During deliberations, the jury asked only for a copy of the ballistics expert's testimony and the call logs of Hampton, Pitts, and Bernetta Lee. The jury unanimously found Hampton guilty beyond a reasonable doubt of both murder in the first degree and armed criminal action.

On June 23, 2021, Hampton's counsel filed a motion for judgment of acquittal notwithstanding the verdict, or in the alternative, for new trial. Hampton's counsel argued the trial court erred in denying Hampton's request to represent himself at trial, and erred in denying his motion to suppress evidence and admitting that evidence at trial. The trial court denied Hampton's motion and entered judgment in accordance with the jury's verdict on December 28, 2021.

Hampton appeals.

### Discussion

*Point I — Self-Representation*

Hampton first asserts the trial court erred in denying his request to represent himself at trial because he timely and unequivocally invoked his right to self-representation. The State responds that Hampton's request was neither timely nor unequivocal. We deny Hampton's Point I because his request was equivocal.

7

Standard of Review

Denial of a defendant's right to self-representation is considered structural error. *State v. Black*, 223 S.W.3d 149, 153 (Mo. banc 2007). Structural error necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. *Washington v. Recuenco*, 548 U.S. 212, 218 (2006). "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). The trial court has no discretion to force an attorney upon a competent defendant who makes a timely, unequivocal, voluntary, and informed waiver of the right to counsel. *Black*, 223 S.W.3d at 153 (citing *State v. Hampton*, 959 S.W.2d 444, 447 (Mo. banc 1997)).

Analysis

A criminal defendant's right to represent himself is implied by the structure of the Sixth Amendment to the United States Constitution. *Faretta v. California*, 422 U.S. 806, 819 (1975). The right of self-representation is applicable to the states by way of the Due Process Clause of the Fourteenth Amendment, and prevents a state from forcing upon a defendant unwanted counsel. *Black*, 223 S.W.3d at 153 (citing *Faretta*, 422 U.S. at 836). This right also is explicitly guaranteed under the Constitution of Missouri and the Rules of Criminal Procedure. Mo. Const. art. I, § 18(a); Rule 31.02(a).[2]

Hampton complains that the trial court erred in denying his request to forego counsel and represent himself "without making any inquiry as to whether it was a knowing and intelligent waiver of counsel." But before a trial court must determine whether a defendant knowingly and

---

[2] All Rule references are to the Missouri Supreme Court Rules (2021) unless otherwise indicated.

intelligently waived the right to counsel, the defendant must timely and unequivocally invoke the right to proceed without counsel and to represent himself. *See Black*, 223 S.W.3d at 153. A defendant's request to represent himself must be unequivocal because it "involves two mutually exclusive constitutional rights: the right to be represented by an attorney, and the right *not* to be represented by an attorney." *Hampton*, 959 S.W.2d at 447. As our Supreme Court has emphasized more than once, "The probability that a defendant will appeal either decision of the trial judge underscores the importance of requiring a defendant who wishes to waive his right to counsel to do so explicitly and unequivocally." *Black*, 223 S.W.3d at 153 (quoting *Hampton*, 959 S.W.2d at 447).

All of that said, Hampton offers only the bare assertion in his appellate brief that his request "was certainly unequivocal." He is incorrect for several reasons.

First, Hampton's request was conditional: "[A]*s long as* Mr. Barron is going to be honest and try to help me prove my case, I don't mind him, you know. *But if* he don't do like I ask him to do . . .." He later added, "[I]*f* Mr. Barron is sitting next to me . . . I'm going to speak as I please because I have the right to aid and assist in my own defense." That is, Hampton's request to represent himself was contingent on counsel's not being honest, not trying to help Hampton prove his case, and not doing what Hampton asked him to do. Otherwise, Hampton not only would not waive counsel, but would "aid and assist" counsel in his defense. Apparently, these contingencies did not materialize, as Hampton never renewed his request and instead proceeded to trial with his counsel. *See*, *e.g.*, *State v. Parker*, 890 S.W.2d 312, 316 (Mo. App. S.D. 1994) (emphasizing the defendant's use of "if" in holding his request to proceed *pro se* was equivocal and conditional).

Second, Hampton interposed his conditional request only after the trial court again denied Hampton's motion to suppress evidence at the pre-trial conference. A motion to proceed *pro se* made "without deliberation" or "on the spur of the moment" generally is not considered unequivocal. *See State v. Garrison*, 928 S.W.2d 359, 362 (Mo. App. S.D. 1996) (citing *State v. Gomez*, 836 S.W.2d 652, 657 (Mo. App. W.D. 1993)). Before he interjected at the pre-trial conference, Hampton had never expressed a desire to forego counsel altogether or to represent himself without the benefit of counsel. To the contrary, what Hampton incessantly demanded in his multiple letters and *pro se* motions was appointment of new counsel, "an exchange of attorney," "fair legal representation," and "the right to proper legal counsel." *See State v. Hamilton*, 791 S.W.2d 789, 796 (Mo. App. E.D. 1990) ("Such a request is not considered unequivocal where the defendant merely states that he would prefer to represent himself rather than accept the aid of his appointed attorney, but would like another attorney appointed who meets his standards.").

Because Hampton's request was equivocal, his Point I is denied.

*Point II — Warrantless Search and Seizure of Evidence*

Hampton next avers the trial court erred in denying his motion to suppress evidence and admitting that evidence at trial. The State responds alternatively that exigent circumstances rendered the search reasonable, the exclusionary rule does not apply, and any error was not material or prejudicial.

Because Hampton fails to show that any error was material or prejudicial, we deny Point II. *See* Rule 84.13(b).

Standard of Review

This Court will affirm the trial court's ruling on a motion to suppress evidence unless it is clearly erroneous. *State v. Burton*, 649 S.W.3d 389, 392 (Mo. App. E.D. 2022). We view the

facts in the light most favorable to the trial court's ruling and disregard contrary evidence and inferences. *Id.* We consider all evidence presented at both the suppression hearing and at trial. *Id.*

Analysis

The Fourth Amendment to the United States Constitution and Article I, Section 15 of the Constitution of Missouri provide equal guarantees against unreasonable searches and seizures. *State v. Little*, 604 S.W.3d 708, 720 (Mo. App. E.D. 2020). As a general rule, warrantless searches and seizures inside a home are presumptively unreasonable and unconstitutional. *Id.* The exclusionary rule precludes the admission of evidence obtained pursuant to an unconstitutional search. *State v. Bales*, 630 S.W.3d 754, 763 (Mo. banc 2021); *see also Little*, 604 S.W.3d at 720.

Still, we review evidentiary rulings for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Sinks*, 652 S.W.3d 322, 346 (Mo. App. E.D. 2022); *State v. Tettamble*, 720 S.W.2d 741, 742 (Mo. App. E.D. 1986). A defendant claiming error in the admission of evidence has the burden of showing both error and prejudice. *State v. Wright*, 551 S.W.3d 608, 616 (Mo. App. E.D. 2018); *Tettamble*, 720 S.W.2d at 742.

"An accused is deprived of a fair trial and prejudice is established if the Court concludes the erroneously admitted evidence improperly influenced the jury to a point at which there is a reasonable probability that, but for the improperly admitted evidence, the jury would have reached a different result." *State v. Hollowell*, 643 S.W.3d 329, 337 (Mo. banc 2022). Error may be harmless if other evidence of guilt is overwhelming, or if the improper evidence was cumulative and not highlighted. *State v. Olten*, 428 S.W.3d 784, 788 (Mo. App. S.D. 2014); *see also State v. Thompson*, 341 S.W.3d 723, 730 (Mo. App. E.D. 2011) ("Admission of improper evidence is harmless if the other evidence of guilt is overwhelming."); *State v. Rutter*, 93 S.W.3d

11

714, 728 (Mo. banc 2002) (concluding, despite State's failure to establish exigent circumstances and plain view exceptions, defendant failed to prove prejudice because evidence that defendant killed victim was "overwhelming").

Hampton has not shown that, but for the admission of the five photographs and limited testimony of the evidence found in his house, the jury would have reached a different result. For starters, Detective Walsh flatly conceded at trial that the shotgun, marijuana, and packaging supplies ultimately were "not significant to the crime scene." In other words, the jury heard from the investigating detective that the evidence found in Hampton's house was not "related to the crime[s] for which he was ultimately charged." *See United States v. Houston*, 920 F.3d 1168, 1173 (8th Cir. 2019) (holding any error from admission of evidence found on defendant pursuant to unconstitutional search was harmless because none of the evidence was "related to the crime for which he was ultimately charged—possessing the pistol found in the ravine."). Further, the State did not highlight, or even mention, that evidence in closing argument, nor did the jury request it during deliberations. *See Olten*, 428 S.W.3d at 788.

Also, Hampton does not challenge the sufficiency of the evidence to convict him. The evidence of Hampton's guilt, independent of the evidence found in his house, not only was sufficient but was overwhelming. *See State v. Hughes*, 563 S.W.3d 119, 127 (Mo. banc 2018) ("As this evidence was sufficient to support the judgment, no prejudice could have resulted from overruling the motion to suppress the actual physical evidence seized."). The evidence included the testimony of three eyewitnesses that Hampton shot Pitts as he fled from Hampton's house. One of those witnesses also testified to Hampton's express intent "to kill this MF" shortly before he did so. *See United States v. Green*, 835 F.3d 844, 853 (8th Cir. 2016) (holding any erroneously admitted evidence was harmless because government introduced sufficient

12

independent evidence to support jury's verdict); *State v. Tims*, 865 S.W.2d 881, 886 (Mo. App. E.D. 1993) (finding evidence overwhelming where defendant was identified by victim and her cousin); *State v. Jimmerson*, 891 S.W.2d 470, 473 (Mo. App. E.D. 1994) (finding evidence, including incontrovertible eyewitness testimony, overwhelming).

For these reasons, Hampton has not established that any error in denying his motion to suppress evidence and admitting that evidence at trial was material or prejudicial. Hampton's Point II is denied.

## Conclusion

We affirm the judgment of the trial court.

_____
Cristian M. Stevens, J.

Gary M. Gaertner, Jr., P.J., and
John P. Torbitzky, J., concur.

13